IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHERLYN KAY HAMILTON,     }
                                    }
       Plaintiff,             }
                                    }
v.                                 }         CIVIL ACTION NO. H-03-1187
                                    }
METROPOLITAN TRANSIT AUTHORITY,  }
                                    }
       Defendant.         }

## OPINION

Pending before the court are the Motion of the Metropolitan Transit Authority ("Metro") for Summary Judgment (Docket Instrument. No. 30) and Motion to Strike (Doc. 37), as well as the Motions of Plaintiff, Cherlyn Kay Hamilton (hereinafter "Hamilton") to Strike (Doc. 32), for Continuance (Doc. 33), and to Compel (Doc. 43).

I.        **Preliminary Matters**

        **A. Hamilton's Motion to Strike**

The instant action was filed April 7, 2003. The Honorable Vanessa Gilmore, prior to her recusal in the matter on November 11, 2003, created an initial scheduling order on September 9, 2003, which set the deadline for completion of discovery for April 15, 2004, and set a dispositive motion filing date deadline for May 15, 2004. On August 29, 2003, Judge Gilmore dismissed without prejudice Hamilton's hostile work environment and equal pay claims. (Doc. 9.) On September 10, 2003, Hamilton had filed for leave to amend her complaint, an opposed motion which the court did not grant until July 2, 2004. Nevertheless, upon Judge Gilmore's recusal and transfer of the instant action to this court, a new scheduling order issued by Magistrate Judge Frances Stacy entered on January 20, 2004, reset the deadline for completion of discovery to August 11, 2004, and the deadline for filing all dispositive motions to August 31, 2004. On August 31st, Metro filed its motion for Summary Judgment. (Doc. 30.)

On September 2, 2004, Metro filed the Affidavit of Attorney Deborah A. Richard and Business Records Custodian, Raymond Fischer, such affidavits intending to authenticate the deposition transcripts of Cherlyn Hamilton and John Franks and 583 pages of Metro business record documents. (Doc. 31.) On September 13, 2004, Hamilton filed her Motion to Strike, asking to strike the aforementioned late filed affidavits of Metro and the documents which they purported to authenticate. (Doc. 32, p. 3.) Hamilton also sought to render the Motion for Summary

Judgment filed by Metro ineffective for failing to provide a date, time, and location for a hearing on the Motion, for failing to include a proposed order, and because Hamilton was allegedly not served with the Motion until September 1, 2004. (*Id*. at p. 5.) The record indicates this late service is *de minimis* and excusable. The court notes initially that there is no requirement under Federal Rule of Civil Procedure 56 that requires a movant to schedule a date and time for a hearing on a motion for summary judgment; furthermore, Rules 7.5 and 7.8 of the Local Rules for the Southern District of Texas explain that a Court has discretion to decide motions without a hearing, even if a request for hearing is made. The failure to request such a hearing with the Motion is therefore no flaw; nor will the court strike Metro's pleadings for failure to attach a proposed order, as in this case such a lengthy summary judgment motion and attendant issues, failure to attach a pro forma order is a *de minimis* oversight.

The court further finds Metro remedied its late filing of the Richard and Fischer affidavits with alacrity, within two days, and such affidavits did not contain factual assertions needed by Hamilton for purposes of responding to Metro's Motion; it would not serve the interests of justice to strike Metro's exhibits to its Motion for Summary Judgment at this late date. *See Travelers Ins. Co. v. Liljeberg Enters.*, 7 F.3d 1203, 1207 (5th Cir. 1993)(unexecuted rebuttal affidavit filed by summary judgment movant for the first time in its reply to plaintiff's response was nevertheless considered by the court without error a month after filing of initial summary judgment, three weeks prior to the court's grant of summary judgment, and even though a fully executed affidavit also had yet to be filed and was filed five days later). Hamilton's Motion to Strike (Doc. 32) is therefore DENIED.

### B. Hamilton's Motion for Continuance

More critical are the issues to which the court now turns, surrounding Hamilton's filing of a Motion For Continuance (Doc. 33) on September 21, 2004, pursuant to Fed. R. Civ. P. 56(f). In her motion, Hamilton sought a continuance for purposes of deposing additional individuals Donna LaForce, Gregory Shepard, David Swenson, and Floyd Lufsey. (Doc. 33, p. 1.) Hamilton stressed that the affidavits of LaForce, Swenson, and Lufsey were heavily relied upon by Metro in its motion for summary judgment, and that Hamilton could not present facts to counter Metro's motion for summary judgment without the opportunity of deposing these individuals. (Doc. 33, pp. 1-4.) Hamilton stated that LaForce was "an essential witness," because she was Hamilton's supervisor, "dealt and interfaced" with Hamilton in an employee-supervisory relationship; and Hamilton stated, LaForce could address the issues of Hamilton's job performance or allegations of "poor" job performance, and her attendance record, issues raised by Metro as a legitimate nondiscriminatory reason for not promoting Hamilton. (Doc. 33, pp. 2 & 3.) In her

Motion to Compel (Doc. 43), Hamilton further elaborates that LaForce's testimony is relevant for determining "the basis for the disciplinary action report," the "timing of the discipline," the retaliation issues, and for clarifying the reasons for the Hamilton's non-promotion, the policies, and practices within LaForce's facilities, and the promotion of others with less qualifications. (Doc. 43, p. 7.)

Hamilton asserted Swenson and Lufsey were human resources and/or quality assurance personnel who were aware of policy, procedure, and practice in the Maintenance Department, the interpretation of terms and conditions of the labor agreement, and quality assurance issues. (Doc. 33, p. 4.) Hamilton states she did not learn of the identities or roles of these latter individuals until Metro's Summary Judgment Motion was filed. (*Id*. at p. 4.) In her Motion to Compel, Hamilton states that the deposition of Gregory Shepard is important as Shepard "is familiar with the grievance history of Hamilton as the union steward who represented Hamilton in many grievances; whereas Lufsey "in [sic] quality assurance department is very important in that he was responsible for the "random" post-audit inspections of buses Hamilton inspected which resulted in the discipline of Hamilton." (Doc. 43, p.7.)

Hamilton had attached a letter to counsel for Metro dated July 27, 2004, which notified metro of Hamilton's intention to take depositions, and included the deposition notices for Gregory Shepard (proposing a deposition date of August 4, 2004), Donna [sic] LaFleur (presumably "LaForce") (proposing August 5, 2004), and John Franks (proposing August 6, 2004). (Doc. 33, Exh. B.) Hamilton includes with her motion a letter dated August 3, 2004, from Metro notifying Jennings that as Plaintiff did not initiate discovery in the case until approximately three weeks prior to the August 11 deadline, and as the discovery deadline had passed, counsel for Metro was unwilling to reschedule the deposition of LaForce without an extension of the dispositive motions deadline. (Doc. 3, letter dated August 3, 2004.) Nevertheless, Hamilton was able to take the deposition of Franks on August 10, 2004.

Hamilton further asserts that several interrogatories and requests for production propounded on Metro and were also not answered. The record indicates that Metro did not receive the interrogatories or requests for production until July 29, 2004, and Metro refused to respond to each such request based on its understanding that pursuant to Fed. R. Civ. P. 33(b)(3) it would have been afforded less than 30 days to answer before the close of discovery. (Doc. 33, attached responses to interrogatories and requests for production.) Finally, Debra Jennings, attorney for Hamilton, avers in her personal affidavit that she delayed in propounding discovery requests because of her breast cancer evaluation, treatment, and other examination. (Doc. 33, Jennings Affidavit, Exh. C.)

### (i.) **Standard for Granting a Continuance**

When a party is not permitted a full and fair opportunity to discover information that is necessary to its opposition to summary judgment, a district court's restriction of discovery is reversible error. *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 719 (5th Cir. 1999) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986)), *cert. denied*, 531 U.S. 917 (2000). Denial of a motion for continuance for additional discovery is reviewed under an abuse of discretion standard and the denial will be affirmed unless the district court's decision is arbitrary or clearly unreasonable and the complaining party shows it was prejudiced by the decision. *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549 (5th Cir. 2000); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 721 (5th Cir. 1995) (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1441-42 (5th Cir. 1993)) (and citations).

There is no requirement under Federal Rule of Civil Procedure 56 that discovery take place before a summary judgment may be granted. *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5 th Cir. 1990); *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997).

To obtain a continuance of a motion for summary judgment, a party must file a motion under Rule 56(f) before the court rules on the motion for summary judgment, giving notice to the court that further discovery is being sought and demonstrating specifically how that discovery is relevant to the pending motion. *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*, 40 F.3d 1474, 1487 (5th Cir. 1995). The party may not rely on vague allegations that additional discovery will produce needed, but unspecified facts, but must indicate to the court, preferably in writing, although not necessarily in the form of an affidavit, why he needs that additional discovery and how it will create a genuine issue of material fact. *Krim*, 989 F.2d at 1442. If the district court in its discretion determines that additional discovery will not produce evidence that will create a genuine issue of material fact, it may grant summary judgment.

The court takes very seriously Ms Jennings' statements that she experienced difficulties with breast cancer in the previous year. However, this case was under a scheduling order both before Judge Gilmore (Doc. 12) which set the completion of discovery for April 15, 2004, and then under a second scheduling order issued by the court (Doc. 23) on January 20, 2004, approximately nine months after the lawsuit had been pending, and setting August 11, 2004, as the discovery deadline, giving Hamilton approximately sixteen months to initiate and complete discovery. It appears discovery was nevertheless not initiated or contested until very late. Hamilton is alleged to have served her first set of disclosures in June 2004, and faxed her first set of written discovery on Defendant on July 23, 2004. (Doc. 38, p. 3.) The court must consider the weighty concerns posed by the protracted time over which organized discovery in this action could

have taken place or during which time another attorney could have been obtained by Ms. Jennings to represent Ms Hamilton, if such was necessary in light of her illness. Instead, late last fall, the court was presented with a superfluity of motions and a factual and procedural tangle, all clustered about the dispositive motions deadline, a situation which unfortunately was not alleviated through clear and concise requests for minimal and speedy additional discovery.

Rather, even after having the opportunity to analyze Metro's arguments and assertions, as laid bare in Metro's Motion for Summary Judgment, Hamilton's Motion for a Continuance does not specify with any particularity how the information Hamilton expected to gather from Metro and the aforementioned undeposed individuals would create a genuine issue of material fact. Metro's arguments are factually specific, yet Hamilton merely expressed to the court in general terms that LaForce was necessary for providing information about Hamilton's job performance, or "poor" job performance, and attendance record (Doc. 33, pp. 2 & 3); further Hamilton expected LaForce to shed light on the bases for her discipline, on retaliation issues, on reasons for her non-promotion, and the policies and practices with LaForce's facilities. (Doc. 47, p. 7.) Surely Ms. LaForce knows about these areas of her employ, that much is clear from Metro's Summary Judgment Motion, which Hamilton had at her disposal, makes clear that La Force knew about Hamilton's employment history, but Hamilton's request for further discovery gives the court no specificity as to *how* or *what* particular information from LaForce would be essential for laying the groundwork to question or rebut any of Metro's asserted legitimate nondiscriminatory reasons as pretextual. Similarly, Hamilton's assertion that Lufsey and Swenson were necessary for their knowledge of the "policy, procedure, and practice in the Maintenance Department" and "the interpretation of terms and conditions of the labor agreement, and quality assurance issues" (Doc. 33, p. 4), as well as Lufsey's knowledge about "random" bus inspections (Doc. 43, p. 7), is too general. Finally, equally flawed is Hamilton's assertion that further discovery from Gregory Shepard is necessary due to his knowledge of Hamilton's grievance history (*Id.*), as such an assertion provides no explanation as to *how* any information garnered from Shepard's knowledge of Hamilton's employment history would be useful for proving her case. Accordingly, Hamilton's Motion for Continuance (Doc. 33) and Motion to Compel (Doc. 43) must be DENIED.

### C. Metro's Motion to Strike Affidavits and Exhibits to Plaintiff's Opposition

Metro has filed a Motion to Strike the Affidavits and Exhibits to Plaintiff's Opposition to Summary Judgment. (Doc. 37.) Hamilton has not filed an opposition or response to this motion and under the Local Rules, the court treats such failure as non-opposition. Nevertheless, the court has reviewed Metro's Motion (Doc. 37) and prior to the court's overall review of the law and the evidence, the court makes the following observations.

As Metro points out, Hamilton's Motion in Opposition to Metro's Motion for Summary Judgment, and the exhibits attached thereto make little, if any, reference to the exhibits submitted in support of her opposition. The court has no duty to "sift through the record in search of evidence" to support Hamilton's opposition. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 and n.7, (5th Cir.) *cert denied*, 506 U.S. 832 (1992). Hamilton's exhibits were submitted in no discernible order and with little, if any, accompanying reference in her brief. Furthermore, each of the affidavits is flawed.

### (i.) Cherlyn Hamilton Affidavit

Hamilton's affidavit suffers from several serious flaws. First, as Metro points out, while Hamilton admitted at her deposition that she did not suffer harassment between 2000 and late 2003 (Doc. 30, Hamilton Depo., Exh. 1, p. 60), she avers in her affidavit that she has been subjected to continuing and ongoing retaliation and harassment. (Doc. 34, Exh. B, ¶ 1.) "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir. 1996) (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir.), *cert. denied*, 506 U.S. 845 (1992)).

Federal Rule of Civil Procedure 56(e) requires that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Unsupported affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment, rather such affidavits must contain a clear explication of factual information that would be admissible at trial. *See Orthopedic & Sports Injury Clinci v. Wang*, 922 F.2d 220, 225 (5th Cir. 1991); *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 194, (5th Cir. ), *cert denied* 109 S.Ct. 310 (1988). Hamilton assertions are legally conclusory:

> I was subjected to continuing [sic] to and ongoing retaliation, intense scrutiny of my job performance, unwarranted discipline for buses that I did not work on, write-ups for an alleged infraction that supposedly occurred six months ago, unequal pay and harassment as recent as May 2004, due primarily because of my gender, female and race, black. (Doc. 34, Hamilton Depo., Exh. B, ¶ 1.)

Metro correctly argues that certain paragraphs of Hamilton's affidavit must be struck because they involve factual scenarios which are no longer actionable, or cannot form the basis of a continuing violation, and hence are not relevant. (*Id.*, ¶¶ 4, 5, 6.)

The court also finds that with respect to Hamilton's claims regarding Koppa and May's skills or experience, the employment circumstances of Anita Wallace or her own husband

(individuals not before this court), the general treatment of female or male employees at Metro, and regarding Donna LaForce's asserted retaliation against Hamilton and the influence of John Franks on her employment actions (*Id.*, ¶¶ 3, 7, 8, 12, 13, 16, 17, 18, 19, 20), such claims are barred because Hamilton has no competent basis in knowledge to make these claims, and such statements do not appear to be based upon her personal knowledge. *See Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003) (affidavits must be based on personal knowledge and not information and belief). These allegations are also legally conclusory.

Paragrapsh 9 and 10 of Hamilton's Affidavit relate to Equal Pay Act allegations which must be struck first, because they are legally conclusory. (*Id.* at ¶¶ 9, 10.) *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195-96 (5th Cir. 1986). Second, these paragraphs relate to Hamilton's unequal pay complaints which occurred in 1996, 1997, and 1998, at a time when Hamilton was promoted to Class B Mechanic; these paragraphs must also be struck because Hamilton was paid more as a result of the complaints (Doc. 30, Hamilton Depo., Exh. 1, pp. 122-23) , the situation was remedied, and moreover, the statute of limitations has run on these claims. The statute of limitations on an Equal Pay Act claim is two years, or three years for a wilful violation. 29 U.S.C. § 255(a).

Hamilton states she was subjected to discriminatory or retaliatory conduct and harassment because of failed bus inspections and disciplinary actions received as a result of work on buses. (Doc. 34, Hamilton Aff., Exh. B, ¶¶ 11(a) - 11(d), 14.) To the extent the court does not address these claims below as part of its analysis of Hamilton's claims, the court notes Hamilton's affidavit recounts these alleged discriminatory, retaliatory, or harassing acts with general language and in a legally conclusory manner. Metro has spent considerable time detailing the disciplinary acts to which Hamilton was subjected and the underlying factual bases for its actions, detailing specific issues with respect to bus problems for which Hamilton was "written up" or disciplined. Though Hamilton had Metro's arguments and supporting facts at her disposal when filing her Reply to the Motion for Summary Judgment and her supporting affidavits, Hamilton does not provide the court the factual elements necessary to show why Metro's statements are flawed. While Hamilton avers she fulfilled her responsibilities with respect to the buses she inspected, giving a few examples wherein she states she found "slack brakes" or a "slack adjuster," she does not distinguish Metro's facts or explain in any detail why her beliefs about her work are inconsistent with Metro's analysis of the problems. The court is therefore provided with Metro's analysis, its description of the underlying facts regarding the problem buses, and Metro's reasoning for its actions with respect to Hamilton, whereas Hamilton, on the other hand, basically asserts that she fulfilled her responsibilities. Self-serving assertions are insufficient to overcome summary judgment; Hamilton fails to identify specific evidence in the record and to articulate the precise

manner in which that evidence supports her claim. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

### (ii.) Ronald Chase Affidavit

While Ronald Chase may be "one of the more Certified Mechanics at [Metro]," and while he may have acted as union steward, gained familiarity with the "labor agreement," and handled "race cases" in the past (Doc. 34, Chase Aff., Exh. A, p. 1 & ¶¶ 2, 8), Chase does not substantiate his basis of knowledge or provide facts from which the court can appraise his competence to testify regarding Metro's hiring and selection of individuals for non-union, management positions such as Yard Supervisor, the use of seniority, the hire of outside applicants, or the application of the "14-day rule," the use of disciplinary actions and "management counseling" to deny an employee's interview, and particularly regarding how such hiring and selection was applied in Hamilton's specific case. (*Id*. at ¶¶ 3, 4, 9, 11, 12, 14, 15, 16.) Furthermore, there is no showing that Chase is competent to testify regarding the relative qualifications of a journeyman mechanic for Yard Supervisor, *vis a vis* those of a service lane cleaner, or that he is competent to testify regarding any individual's capabilities to perform the duties of the Yard Supervisor position. (*Id*. at ¶¶ 7, 9, 11.) Nor is Chase's opinion regarding any discriminatory *modus operandi* of John Franks or Metro, or the "way [M]etro works" worthy of credence as clothed in conclusory language. (*Id*. at ¶¶ 10, 14, 16.)

Chase, like Hamilton, also makes reference to older disciplinary incidents which have no bearing on this case (*Id*. at ¶¶ 5 & 6), makes several legally conclusory statements (*Id*. at ¶¶ 9, 10, 14) and statements based upon belief, not personal knowledge. (*Id*. at ¶¶ 7, 9, 11, 14.)

### (iii.) James Whaley Affidavit

James Whaley's affidavit also contains inadmissible summary judgment evidence. Metro is correct that Whaley's personal record has no relevance to the issues before the court. (Doc. 34, Whaley Aff., Exh. D, ¶¶ 1-5.) Whaley's statements based on information and belief and *not* personal knowledge, particularly as to Hamilton's employment record or his understanding of Metro's policies are not competent evidence. (*Id*. at ¶ 5, 6, 10, 11, 12, 14, 21 & 23.) Furthermore, the incidents involving Hamilton's promotion to journeyman mechanic in 1994 or 1995 are time barred. (*Id*. at ¶ 5; Doc. 30, Hamilton Depo., Exh. 1, p. 10.) As with Hamilton's Affidavit, Whaley's statements about Anita Wallace's employment history are irrelevant as such issues are not before the court. (*Id*. at ¶¶ 7, 8, 9 & 10.) Whaley's statements regarding whether bus 4704 was properly handled are admittedly based on his beliefs or opinions and are not competent evidence.

(*Id*. at ¶¶ 15-19.)  Furthermore, Whaley's beliefs or opinion regarding any "rumor" surrounding the apportionment of discipline regarding bus 4117 is not competent evidence.  (*Id*. at ¶¶ 20-22.)

### (iv) Gregory Shepard Affidavit

Gregory Shepard, a Grievance Representative, asserts that he has represented Hamilton on several grievances.  (Doc. 34, Shepard Aff., Exh. 4, pp. 1, 2 & 3.)

The first paragraphs on the second page and seventh pages of Shepard's affidavit should be struck because they are incomplete, nonsensical, and incomprehensible.  (*Id*. at ¶ 5; Shephard's affidavit is neither paginated nor broken into numbered paragraphs.  The court has numbered the paragraphs in descending order, treating each indentation as a new paragraph, *not* including the un-indented first section on the second page.)  Perhaps the most complicated aspect of Shepard's affidavit is that it is filled with mistakes, sentence fragments, inconsistent statements, and the  overall organization of the material is very poor.  Shepard's affidavit often strays outside the limits of his qualifications.

Furthermore, while Shepard may be qualified to aver as to facts regarding the grievances he processed on behalf of Hamilton or about the grievance process itself, perhaps the subject of his expertise (*Id*. at ¶ 20(1) - 20(5)), his affidavit is also replete with beliefs, opinions, statements regarding what the union "felt", and statements regarding his suspicions or what he considers "unusual" at Metro; these statements do not qualify as competent evidence based on his personal knowledge.  (*Id*. at ¶¶'s 9, 10, 11, 13, 23, 24 & 25.)  Shepard also does not present evidence qualifying him to opine concerning Hamilton's qualifications for a Yard Supervisor position, and his statements to this effect appear to be mere conjecture.  (*Id*. at ¶¶ 18, 19, 23, 27, 28 & 29.)  Metro argues that Shepard is not qualified or competent to testify regarding the qualifications for a non-union management position such as Yard Supervisor.  (Doc. 37, p. 19.)

Neither is it clear what relevance Shepard's recounting of other grievants' cases, or what relevance the history and status of other discriminatory actions filed by other grievants or plaintiffs at Metro have to Hamilton's case.  (*Id*. at ¶¶ 17, 20, 21, 22 & 31.)  This is especially important as Hamilton is not able to assert a pattern or practice claim on behalf of herself as an individual.  *See infra*, p. 18 (*citing Frank v. Xerox*, 347 F.3d 130 (5th Cir. 2003) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355-56 (5 th Cir. 2001)).  Finally, there is no factual basis provided for Shepard's conjecture about Franks' intentions.  (*Id*. at ¶¶ 10, 24 & 25.)

**(v) Allen Kent Hamilton Affidavit**

Allen Hamilton's averments concerning Cherlyn Hamilton's non-promotion upon passing the journeyman mechanics exam are time-barred and irrelevant to the issues at hand. (Doc. 34, Allen Hamilton Aff., Exh. T, ¶ 2.) Allen Hamilton's beliefs, opinions, and legal conclusions that Cherlyn Hamilton was discriminated against are his beliefs and do not provide the substance of his personal knowledge, and the court cannot accept his legally conclusory statements. (*Id*. at ¶¶ 3, 5, 8.) Finally, Hamilton does not provide evidence to the court concerning his competence to discuss the choice of Wesley Newsome, the employment policies and practices of Metro, and his description of Newsome's promotion is conclusory and based in part on hearsay. (*Id*. at ¶¶ 4, 6-8.)

## II.        Summary Judgment Standard

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element. *Fontenot v. Upjohn,* 780 F.2d at 1195. If the moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ. P. 56(c). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R.Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine issues of fact extant in the summary judgment evidence produced by the movant, if any. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

## III.        Factual and Procedural Background

Hamilton asserts she was denied promotions to the position of Yard Supervisor and to "the relief pool," based on race, gender, and age, in violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 623 *et seq*. Hamilton is female, black, and over 44 years old. In addition, Hamilton alleges she was retaliated against because she filed a charge of discrimination challenging Metro's failure to promote her to the Yard Supervisor position, in violation of Title VII. Finally, Hamilton alleges she was paid less than male employees for equal work and that she was subjected to harassment; though these latter two claims were dismissed by Judge Gilmore, Metro has nevertheless addressed them.

Hamilton is currently employed as a journeyman mechanic in Metro's Bus Maintenance Division, an hourly, non-management position covered by the collective bargaining agreement between Metro and Local 260 of the Transport Union of America, AFL-CIO. (Doc. 30, Exh. 1; Hamilton Deposition, p. 14-18.) Hamilton was initially hired by Metro as a "service line cleaner" in 1984, and held that position until 1987, when she changed positions to a "shop cleaner." (*Id.* at p. 6.) After passing the "Journeyman Mechanic Exam" in 1994, Hamilton was promoted to class "B Mechanic," a position she held until 1996, and thereafter she held the positions of "A Mechanic" (1996-97), "Journeyman Mechanic" (1998-present), Relief Service Writer/Relief Yard Supervisor (1987-97), and the position of "Lead Person" (2002-03). (Doc. 34, p. 2-3; *See also* Hamilton Aff., Exh. B ¶ 2.) In 1989, Hamilton avers that she filed a sexual harassment case against two supervisors, James Deal and Donald Madison. (Doc. 34, Hamilton Affidavit, Exh A ¶ 1.)

In late 2001, the Bus Maintenance division developed a relief pool, composed of ten employees, for training mechanics and bus repairmen to become mechanical supervisors. (Doc. 30, Shawn Lindemann Aff., Exh. 2, ¶ 2; John Franks Aff., Exh. 3, ¶ 4.) According to John Franks ("Franks"), Senior Director of Bus Maintenance, Metro has a practice whereby an employee who has a disciplinary action report on his or her record within the last two years was not allowed to interview for a different position. (Doc. 30, Franks Aff., Exh. 3, ¶ 4; Franks Depo., Exh. 4, pp. 99-100.) Hamilton stated in her deposition that a suspension is held on one's record for two years, and that a disciplinary action has a 'window' of two years. (Doc. 30, Hamilton Depo., Exh. 1, pp. 65 & 72.) Franks further avers that

> As Senior Director of Bus Maintenance, I do not directly supervise mechanics such as the Plaintiff, and I do not have any knowledge regarding particular assignments given to Ms. Hamilton. As well, I do not have any involvement in or knowledge of any particular inspections performed by the Plaintiff, except for those that were subjects of a grievance that reached my level through the grievance process. I do not verify whether any individual has performed or completed his or her duties satisfactorily. The employee's foremen, general foremen and superintendent have the responsibility for ensuring that an employee performs his or her work in a satisfactory manner, and for administering discipline to the employees that they directly supervise. Accordingly, I am not normally involved in the discipline of mechanics or other hourly employees. (Doc. 30, Franks Aff., ¶ 3.)

Metro asserts Hamilton was not allowed to interview for the relief pool position in 2001 because she had a disciplinary action report on her record, dated May 30, 2000, for a five day suspension received for being absent without leave and for failing to follow instructions; and, this discipline had not expired and therefore existed within two years of Hamilton's application during the selections for the relief pool, a process completed by December 17, 2001. (Doc. 30, Franks Aff., Exh. 3, ¶ 4; Exh. 5.)

Thereafter, in June 2002, another round of interviews was held for one vacancy in the relief pool. (Doc. 30, Lindemann Aff., Exh. 2, ¶ 3.) Shawn Lindemann, mechanical foreman at Metro's Hiram Clarke facility, avers that Hamilton was interviewed by a panel, and all candidates were ranked numerically based on their interviews. (Doc. 30, Lindemann Aff., Exh. 2, ¶ 3; *See also*, Attachment "A.") Lindemann avers that "Tyron Pleasant," a black male, received the highest score and was selected for the vacancy. (*Id.*)

In July/August, 2002, Hamilton applied for a salaried position with Metro as a Yard Supervisor II in the Maintenance division, and she was interviewed by Donna LaForce ("LaForce") Superintendent of Maintenance at Metro's Fallbrook facility, and David Swenson ("Swenson") the general foreman. (Doc. 30, Exh. 1, Hamilton Depo., pp. 19-21; LaForce Aff., Exh. 6, ¶ 1 & 4.) According to LaForce, a Yard Supervisor II is responsible for managing the afternoon pull-in of buses, with responsibilities including debriefing bus operators, inspection of incoming buses for obvious defects and/or damage, directing the work of mechanics, and interacting with

maintenance/repair to ensure buses are repaired, serviced, fueled, cleaned, and ready for pull-out the next day. (Doc. 30, LaForce Aff., Exh. 6, ¶ 3.) The Yard Supervisor II position required 3 to 5 years experience in yard supervision, mechanical experience servicing **vehicles**, and, or preventative maintenance experience. (Doc. 30, Exh. 7) (emphasis added).

LaForce avers she interviewed Hamilton, Donald May, John Cruz Stellus, Paula Russell, Albert Stocker, and Tobias Barber for the position, May and Stocker being external candidates, and selected Donald May, a white male, because he was the best qualified. (Doc. 30, LaForce Aff., Exh. 6, ¶ 4.) According to LaForce, May had extensive experience in preventive and mechanical maintenance, management of fleet vehicles and equipment, and supervision and management of employees over a 20 year career with the U.S. Marine Corps. (*Id*.; *See also* Attachments A & B, Exh's 8 & 9.) LaForce avers that the Yard Supervisor II at Fallbrook directs the work of several mechanics and indirectly supervises the many bus operators assigned to that facility, but that Hamilton did not have significant experience supervising or managing employees when compared with the successful candidate, May, and further, that Hamilton did not "sell" her skills and experience for the job in the interview. (*Id*.) Finally, LaForce avers that John Franks, Senior Director of Bus Maintenance, did not participate in the interviews for the position and did not direct or tell her who to choose for that position. (*Id*. at ¶ 5.)

Following May's selection for the Yard Supervisor II position, Hamilton appeared before Metro's Board of Directors on September 19, 2002, and complained about the existence of a glass ceiling for women in maintenance, and that she had been denied promotions to management positions because of an EEOC charge that she filed in March, 1997. (Doc. 30, Exh. 17.) It was at this point, on December 6, 2002, that Hamilton filed her first Charge of Discrimination ("charge") with the EEOC forming the subject of this action, alleging she had been discriminated against on the basis of race, age, and gender through non-selection for the position May had instead received. (Doc. 30, Exh. 27.)

May remained employed with Metro until he voluntarily resigned to accept a better-paying job, at which point Hamilton re-applied for his position. (Doc. 30, Franks Depo., Exh. 4, p. 182; Hamilton Depo. p. 32.) David Swenson ("Swenson"), who was general foreman at Metro's Fallbrook Facility in 2002, served on a panel that conducted interviews with Hamilton along with other external and internal applicants in early 2003, after May's voluntary resignation. (Doc. 30, David Swenson Aff., Exh. 11, ¶ 2.) The interview panel included Swenson, maintenance superintendents Ignacio Ybarra and Melvin Thomas, general foreman Marlon King, and Thomas Osborne of Human Resources; the interviewees included external applicant Dennis Koppa, and internal applicants John Cruz Stellus, Sheila Pichon, Woodrow Williams, and Corliss Madison. (*Id*. at ¶ 3.) Swenson avers Koppa was selected because he scored highest on the interview, and Swenson further adds that Koppa, a white male, had many years experience in maintenance,

including fleet management, preventive maintenance, maintenance planning and repair, supervision of maintenance employees, and experience using SEMA, the maintenance computer system used by Metro. (*Id*. at ¶3, Att. B & C; Exh's 12 & 13.) Metro refers to and attaches an "Applicant Interview Assessment Report" for Hamilton, dated March 6, 2003, which states that "applicant appears to *not* meet the requirements fo the managerial skills required for the position." (Doc. 30, p. 4, Swenson Aff., Exh. 11, ¶ 4, citing Attachment F; *See also* Exh. 10) (emphasis added.) Swenson further avers that the interview panel determined that Sheila Pichon, who was the second highest scorer in the interviews, was also qualified for the position. (Doc. 30, Swenson Aff., Exh. 11, ¶ 4, Att. A, D & E; *See also* Exh. 14.)

According to Thomas Osborne III ("Osborne"), an Employee Relations Specialist in the Human Resources Department at Metro, Koppa voluntarily resigned from Metro shortly after his employment began. (Doc. 30, Thomas Osborne III Aff., Exh. 16, ¶ 2 & 3; *See also* Exh. 15.) Osborne avers that Metro policy states that if a position has been posted and awarded, and a vacancy occurs in that position within sixty days after the hire date, the vacancy may be filled from the original applicant pool; as Ms. Pichon was the next highest scorer, she was awarded the Yard Supervisor II position following Koppa's resignation. (Doc. 30, Osborne Aff., Exh. 16, ¶ 3, Att. A.)

Floyd Lufsey ("Lufsey"), a Quality Assurance inspector in the Maintenance Division at Metro, avers that he performs random inspections of buses that have been inspected by mechanics ("major inspectors"). (Doc. 30, Floyd Luffsey Aff., Exh. 22, ¶ 2.) Quality Assurance is not part of Bus Maintenance, the division in which Hamilton works; rather, it is a division of Maintenance Support and does not report to Bus Maintenance. (Doc. 30, Floyd Luffsey Aff., Exh. 22, ¶ 2; Franks Depo., Exh. 4, pp. 174-75.) Lufsey avers that during major inspections, the mechanics responsible inspect the buses every 6,000 miles, and that Quality Assurance has a 500 mile 'window' following the date of a major inspection to perform a random post-inspection audit of a bus. (Doc. 30, Lufsey Aff., Exh. 22, ¶ 3.) For a quality assurance re-inspection, Lufsey randomly selects buses verified as "good" based solely upon his review of a "Major Inspection Defects List," i.e., a list of buses by number, status, and defects, showing which buses have been inspected and verified as buses available for release into service ("good") or needing repair ("down"); referring to such a list, Lufsey avers that this list does not reflect the name or Metro I.D. of the employee mechanic who performed the major inspection on the bus. (*Id*; *See* Attachment B.) Once a bus arrives for an audit, Lufsey then 'pulls' the inspection card for the bus, which card does have the name of the mechanic who inspected the bus that he has chosen to audit. (*Id*.) Once the inspection is complete, Lufsey forwards to the superintendent, a "Preventive Maintenance Reinspection Sheet" reflecting his audit's findings, which report provides notice to the superintendent, general foreman and manger of Quality Assurance. (Doc. 30, Lufsey Aff., Exh.

22, ¶ 4; *See* Att. A.)  Lufsey twice avers that he does not report to superintendent LaForce or Senior Director Franks, and that he has not been directed by them to closely scrutinize or "single out" Hamilton's work, so that she could be disciplined, for any reason.  (Doc. 30, Lufsey Aff., Exh. 22, ¶¶ 2 & 5.)

In November 2003, Hamilton transferred to Metro's Fallbrook facility and was assigned to major inspections.  (Doc. 30, Hamilton Depo., Exh. 1, p. 17.)  In March 2004, Hamilton applied yet again for a Yard Supervisor II position, but was allegedly not allowed to interview for the position because of Metro's stance on disciplinary actions within the past two years.  (Doc. 30, Franks Depo., Exh. 4, pp. 45-7, 85, 118-121, 178-79; Franks Aff., Exh. 3, ¶ 4.) In March, shortly before the interviews for the Yard Supervisor II position were conducted, a review of the internal candidates' records reflects that Hamilton had three disciplinary actions in her file for poor performance, and these were: the management counseling issued by LaForce related to items involving bus number 3233, assessed on December 3, 2003; the management counseling Hamilton received for the accident involving bus number 4117 and subsequent management counseling assessed on March 9, 2004; and the reprimand Hamilton received for two safety items missed on bus number 4704, apparently constituting a violation from February 19, 2004, with the subsequent reprimand assessed on March 8, 2004.  (Doc. 30, Franks Depo, Exh. 4, pp. 46-47, 85, 118-121, 178-79; Exh. 18, Exh. 19, Exh.20.)  The history behind these disciplinary actions is as follows.

First, on December 3, 2003, Hamilton had received a disciplinary action report, a "reprimand" for poor job performance  related to a failed post-inspection of bus number 3233. (Doc. 30, Hamilton Depo., Exh. 1, p. 138; Exh. 18.)  Through the grievance process, the reprimand was reduced to a lower level of discipline, management counseling, by superintendent LaForce. (Doc. 30, Hamilton Depo., Exh. 1, p. 139.)  Hamilton states in her deposition that during the grievance procedure, she informed LaForce that "there was not enough evidence for them to tell [her] that she did not find these items," and that as a result, "[Metro] started taking pictures" of the buses as proof, but because the audit on her bus was complete, LaForce reduced her discipline. (*Id*. at pp. 138-139.)  Hamilton stated at her deposition, however, that her discipline was nevertheless not "wiped out."  (*Id*. at p. 139-40.)

Second, on March 8, 2004, Hamilton received a reprimand for a poor work performance violation dated February 19, 2004, in relation to a failed post-inspection audit on bus number 4704.  (Doc. 30, Exh. 18.)  Although Hamilton challenged this reprimand through grievance procedures, management's actions were upheld.  (Doc. 30, Exh. 23.)  Metro refers to a "Grievance Form Step Two (2)," wherein it is stated that a grievance hearing was held on April 16, 2004, with respect to Hamilton's major inspection of bus number 4704 on February 16, 2004; that this bus failed a Quality Assurance inspection and Hamilton was reprimanded for job

performance; that this is her second violation of article "1502-A Job Performance" (this may incorrectly refer to article 1501-A) which states that "[e]mployees shall not consistently fail to meet reasonable established performance job standards;" and that her grievance is denied, dated May 21, 2004. (Doc. 30, p. 8; citing Exh. 26; *See also*, Doc. 30, p. 7; citing Exh. 25, p. 31, Employee Performance Code and Work Rules, Job Performance, article 1501-A.)

Third, Hamilton and other mechanics were disciplined for poor job performance relating to bus number 4117, a bus that she had inspected while assigned to her previous role at the Polk facility. (Doc. 30, Franks Aff., Exh. 3., ¶ 3.) Franks avers that although he is not normally involved in the discipline of mechanics or other hourly employees, when a major accident occurred with bus number 4117 on February 25, 2004, he took the step of intervening, based on the post accident report issued by the Quality Assurance division of the Maintenance department. (*Id*.; Att. A, memorandum of Robert Sevilla, Manager, Quality Assurance.) According to the memorandum prepared for the accident, the bus was involved in an accident when the left front wheel assembly separated from the bus and struck a privately owned vehicle causing damage. (*Id*, Att. A, p. 1.) The report stated that the cause of the wheel separation was a direct result of the wheel bearing, retaining nut, and setscrew not being properly torqued during an installation process which had occurred as part of a two wheel, front brake job occurring on July 4th through the 5th, 2003. (*Id*.) The report further stated that within the 27,000 miles from the brake work to the day of the accident, this bus had received four major inspections; that in major inspections, the front end king pins and wheel bearings are to be checked; that human error was "most likely the cause for the improper torquing of the adjusting nut set screw on the wheel bearing;" that the bus "went through four different PMI's before failure;" that "[i]f this check was done properly, the problem might have been found before failure occurred," but "[t]hat is not to say that the inspection was not performed properly." (*Id*. at pp. 2-3.) Metro also refers to a memorandum entitled "Step One (1) Grievance Response" dated March 31, 2004, from James Perkins, Superintendent, Polk Maintenance, wherein it was stated that Hamilton had been "informed that her level of performance when she performed her inspection of bus 4117 was unacceptable and did not conform to standards," and that when she "performed her inspection the defect of a [sic] improperly torqued bolt would have been identified." (Doc. 30, Exh. 19.) Franks avers that

> [b]ecause of the serious nature of the accident, and Quality Assurance's conclusion that substandard maintenance performance caused the accident, [he] instructed James Perkins, the superintendent at the Polk Street facility where the maintenance work was performed, to determine the identities of, and to discipline, those mechanics who installed the pertinent parts, and those who inspected Bus No. 4117 between the installation and the date of the accident. The Plaintiff inspected Bus. No. 4117 on September 10, 2003, and was one of the several mechanics disciplined as a result of the accident with Bus No. 4117. Along with the Plaintiff, mechanics Eddie Jones, black male, Juan Clemente, Hispanic male, Rafael Longoria, Hispanic male, and Joan Stone, black female, were disciplined...
> (Doc. 30, Franks Depo., Exh. 3, ¶ 3.)

Hamilton received management counseling, and other inspectors who had inspected the bus in the past received discipline in the form of counseling or reprimands.  (Doc. 30, Hamilton Depo. Exh. 1, pp. 140-141; Franks Depo., Exh. 4, p. 186.)   Franks testified that Hamilton and others were disciplined because "[i]n QA's investigation they found that it was human error and the people that worked on that bus should have been able to identify that failure before that wheel fell off on the street."  (Doc. 30, Exh. 4, pp. 181-82.)  Franks avers that "[o]ther than this isolated incident, based on extenuating circumstances, [he] never participated in discipline for the Plaintiff, nor [has he] ever directed or instructed any of her supervisors, or anyone at all, to take any disciplinary action against the Plaintiff."  (Doc. 30, Franks Aff., Exh. 3, ¶ 3.)  Hamilton appears to have received this management counseling disciplinary action as of March 9, 2004, but it was also subsequently dated as having occurred on February 26, 2004.  (Doc. 30, Exh. 20; Exh. 21.)

On May 25, 2004, Hamilton was assessed a five-day suspension for poor job performance on a disciplinary action report ("DAR"); the report stated that a post-audit inspection completed on May 14, 2004, had revealed that Hamilton had missed several items on inspection of bus number 4836.  (Doc. 30, Exh.21.)  At step two of the grievance process, however, Franks testifies that because of confusion created by the inclusion of two bus numbers on a photo of the bus, Franks reversed the suspension, directed that Hamilton be paid for time lost from work, and had the DAR removed from her file.  (Doc. 30, Franks Depo., Exh. 4, pp. 173-74.)  Franks states that once a DAR is removed from a file, "it's like it doesn't exist."  (*Id*., Franks Depo, Exh. 4, p. 185.)

Hamilton has filed two charges with EEOC.  (Doc. 30, Exh. 27 & 28.)   As mentioned previously on or about December 11, 2002 (signed December 6, 2002), she had filed a charge alleging that "[o]n or about July 1, 2002, [she] had applied for a promotion  to a Yard Supervisor position;" that "[a]round August 10, 2002, [she] found out that [she] did not get the position and it was given to a young white male who was not previously employed with Metro;" that she knew she was better qualified but was told that the other applicant was better qualified; and, that she believed she was discriminated against because of her race, Black, her sex, female, and her age, 44, in violation of Title VII.  (Doc. 30, Exh. 27)

Again, on March 18, 2004, Hamilton filed a second charge with the EEOC, wherein she alleged that on December 5, 2003, March 5, 2004, and March 15, 2004, she was written up and given bad evaluations through no fault of her own.  (Doc. 30, Exh. 28.)  She stated that "this type of retaliation started after [she] filed a charge of discrimination at EEOC on or [sic] December 11, 2002," and that "[d]ue to the retaliation [she has] not been given an opportunity to be selected for supervisory positions such as for the Yard Supervisor."  (*Id*.)

She further stated that whereas during 2003, she was told that she was not as qualified as the selected candidates, her write ups were the reason given to her for her nonselection on February 17, 2004, when she applied for the Yard Supervisor position. (*Id.*) Finally, Hamilton stated that she believed "that [she was] retaliated against through harassment, because of [her] race,. [sic] Black, Age, in violation of Section 704(a) Title VII fo the Civil Rights Act of 1964, and Section 4(d) fo the Age Discrimination in Employment Act of 1967." (*Id.*)

## IV.      Analysis

### A.  Exhaustion of Administrative Remedies

Initially, the court notes that under Fifth Circuit precedent, a pattern or practice claim cannot be alleged by an individual plaintiff, as such a claim is not available in a private, non-class action. *See Frank v. Xerox*, 347 F.3d 130 (5th Cir. 2003) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355-56 (5 th Cir. 2001)). Hence, any such claim by Hamilton is dismissed as a matter of law.

Further, Metro argues it is clear from Hamilton's EEOC charges, that because she failed to present her claims of age and sex discrimination relating to Metro's failure to promote her to the relief pool in 2001 and 2002, and to Yard Supervisor II in 2003 and 2004, she is precluded from pursuing age and gender-based discrimination claims as to these occurrences. (Doc. 30, p. 10.) The law supports and bears out the logic behind this argument.

Exhaustion of administrative remedies occurs when a plaintiff files a timely charge with the EEOC and receives a statutory notice of a right to sue. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002) (*citing Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996)). "It is well-settled that courts have no jurisdiction to consider Title VII claims as to which the aggrieved party has not exhausted administrative remedies." *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 711 (5th Cir. 1994) (citing *Tolbert v. United States*, 916 F.2d 245, 247-48 (5th Cir. 1990)). The Court of Appeals applies the same administrative exhaustion requirements in race, gender, and age discrimination as well as retaliation cases arising under Title VII. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, n. 3 (5th Cir. 2000) (explicitly approves the use of the Title VII framework in ADEA cases.); *See, e.g., Woodhouse v Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir. 1996). "Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Also, "[a]n individual cannot take legal action in an ADEA case in Texas unless that individual first files an administrative charge within 300

days of the last act of discrimination." *Bettcher v. Brown Schs., Inc.*, 262 F.3d 492, 494 (5th Cir. 2001) (citing *Anson v. Univ. of Tex. Health Sciences Center*, 962 F.2d 539, 540 (5th Cir. 1992)).

More importantly in the context of this case, however, "[t]he scope of inquiry of a court hearing in a Title VII action "is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Young v. Houston*, 906 F.2d 177, 179 (5th Cir. 1990) (citing *Sanchez v. Standard Brands*, 431 F.2d 455, 466 (5th Cir. 1970)). The Court of Appeals has held "that a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission." *Nat'l Ass'n of Gov't Employees*, 40 F.3d at 711 (citing *Sanchez*, 431 F.2d at 466.) Overall, "[t]he crucial element of a charge of discrimination is the factual statement contained therein." *Sanchez*, 431 F.2d at 462. "In this circuit, a claimant is not required to assert all legal claims in the EEOC charge; rather, it is sufficient if in the EEOC charge the claimant asserts the facts that are the basis for the legal claims." *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 795 (5th Cir. 2002).

It is clear that Hamilton's factual assertions in her December 11, 2002 charge related solely to race, gender, and age claims based upon her failure to obtain the Yard Supervisor II position for which she began applying in July of 2002, and which position was awarded to Don May. (Doc. 30, Exh. 27.) Furthermore, Hamilton's assertions in her charge from March 18, 2004, factually specify that she is being retaliated against in the form of disciplinary actions by Metro as a result of her EEOC charge from December 11, 2002. (Doc. 30, Exh. 28.) Metro argues that Hamilton's failure to present her claims of age and sex discrimination relating to Metro's failure to promote her to the positions in the relief pool and to Yard Supervisor II in 2003 and Yard Supervisor II in 2004 preclude her from pursuing age and gender based discrimination claims in this action as to those alleged failures to promote. (Doc. 30, p. 11.) Furthermore, the filing of the Hamilton's retaliation charge, Metro argues, was insufficient to exhaust administrative remedies for all alleged age and gender discrimination and for all challenged promotional decisions at Metro. (Doc. 36, p. 3.) *See Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 395 (5th Cir. 2000); *Chanda v. Englehard/ICC*, 234 F.3d 1219, 1224-25 (11th Cir. 2000). Based upon a review of the filed charges and applicable law, the court agrees.

Nevertheless, Hamilton may rely upon § 1981 to allege claims of race discrimination as to which she did not file an EEOC charge, because "[t]he use of section 1981 as an avenue for redress of employment discrimination is not constrained by the administrative prerequisites [applicable to] Title VII claims . . . ." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (citing *Scarlett v. Seaboard Coast Line R. Co.*, 676 F.2d 1043, 1050 (5th Cir. Unit B 1982)). However, while even a claim of retaliation can be brought under § 1981, *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003), Hamilton cannot raise her age or gender

discrimination claims under the § 1981 rubric with respect to her failures to obtain positions in the relief pool in 2001 and 2002, or her failure to obtain a Yard Supervisor II position in 2003 or 2004. This is because § 1981 prohibits only racial discrimination claims. *See Evans v. City of Houston*, 246 F.3d 344, n. 9 (5th Cir. 2001) (citing *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir. 1986)).

### B. Hamilton's Claims

As causes of action for racial discrimination under Title VII and Section 1981 are governed by the same evidentiary framework, *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448, n. 2 (5th Cir. 1996), the court will apply the same framework where Hamilton's race discrimination claims come solely under §1981.

Under either the Title VII or §1981 framework, Hamilton must prove that Metro discriminated against her by presenting a *prima facie* case through offering direct or circumstantial evidence. *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994). Discrimination can be shown indirectly by following the "pretext" method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and *Mooney v. Aramco Serv's. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995). However, the test utilized in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), comes into play where *direct* evidence of discrimination is presented, but the employer asserts that the same adverse employment decision would have been made regardless of discrimination. *Mooney*, 54 F.3d at 1216, n. 10.[1]

To establish a *prima facie* case of race, sex, and age discrimination, Hamilton must show that (1) she is a member of a racial or gender group and/or class of persons protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)); (2) she was otherwise qualified for the position for which she applied; (3) despite her qualification, she was denied a position (4) the employer promoted a person of similar qualifications who was not a member of the protected group or class. The elements of the *prima facie* case can be stated in a variety of ways. See *Crawford*, 234 F.3d at 902. With respect to age discrimination in particular, the fourth element of the prima facie case is stated as (4) "[she] was replaced by someone outside the

---

[1] In the *Price Waterhouse* framework ... the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production. Both the burden of production and the risk of nonpersuasion are shifted to the defendant who, because of the inference the overt evidence showing the employee's bias permits, must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus. (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3rd Cir. 1994)).

protected class, someone younger, or was otherwise discharged because of age." *Russell*, 235 F.3d 223-24.[2]

To prevail on her claim for retaliatory discharge under Title VII, 42 U.S.C. § 2000e-3(a), Hamilton must initially make a prima facie case by showing by a preponderance of the evidence that (1) she engaged in an activity protected by Title VII, (2) the employer took an adverse employment action against her, and (3) there was a causal connection between the protected activity and that adverse reaction. *Mota v. The University of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir. 2001); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995); *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983). A plaintiff must demonstrate that he had at least a reasonable belief that the practices he opposed were unlawful. *Mayberry*, 55 F.3d at 1092; *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981); *Long*, 88 F.3d at 304. An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Long*, 55 F.3d at 1092 (citing 42 U.S.C. § 2000e-3(a)). Furthermore, to demonstrate causation, plaintiff must demonstrate that "but for" the protected activity, the adverse employment action would not have occurred. *Id.*

In proving her discrimination case through circumstantial evidence, Hamilton's claims of discrimination are governed by the tripartite burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this test, (1) if Hamilton establishes a *prima facie* case of discrimination, then a presumption of discrimination arises and (2) the burden shifts to Metro to articulate a legitimate, non-discriminatory reason for its employment action. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).

Metro's showing is satisfied if it produces evidence, which, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (*citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)(emphasis in original). "[T]he promotion of a better qualified applicant is a legitimate and nondiscriminatory reason for preferring the successful applicant over the rejected employee who claims that the rejection was discriminatory." *Price*, 283 F.3d 721, n.2 (citing *Jefferies v. Harris County Cmty. Action Ass'n.*, 693 F.2d 589, 590 (5th Cir. 1982)). If Metro satisfies this burden, and articulates a reason that can support a finding that its actions were nondiscriminatory, "the mandatory inference of

---

[2]To establish a *prima facie* case based on a failure to *promote*, a plaintiff must show: (1) that she is in a protected class; (2) that she was qualified for the position sought; (3) that she was not promoted; and (4) that the position was filled by someone outside the protected class. *Blow v. City of San Antonio*, 236 F.3d 293 (5th Cir. 2001) (emphasis added).

discrimination created by the plaintiff's *prima facie* case drops out." *Id*. (citing *Hicks*, 509 U.S. at 510-511). Furthermore, if Metro satisfies this burden, the burden of production shifts back to plaintiff, who must be afforded the opportunity to (3) prove that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2104-05, 147 L. Ed. 2d 105 (2000). In employment discrimination cases, the plaintiff, at all times, retains the ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination. *St. Mary's Honor Center*, 509 U.S. at 508. In *Reeves*, the Court stated that under Title VII, a plaintiff's *prima facie* case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. Such a showing will not always be adequate, for example, "if the plaintiff created only a weak inference of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id*.

This burden-shifting structure applicable to Title VII disparate treatment cases, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), is also applicable to unlawful retaliation cases. *Id*. (citing *McMillan*, 710 F.2d at 1116.) Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action, which in turn, leads to the ultimate question of retaliation. *Id*. Therefore, the "ultimate issue" in a retaliation case, whether the defendant discriminated against plaintiff because plaintiff engaged in protected conduct, involves finding a "but for" cause, whereas the causal link necessary for a *prima facie* case involves merely a showing that the plaintiff's protected conduct was a "substantial element" in the defendant's decision to act adversely against the employee. *Id*. at n. 4. (citing *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984)). Finally, both discrimination and retaliation causes of action require proof of an adverse employment action.

### (i.) The Requirement of an Adverse Employment Action

"'Adverse employment actions' include only 'ultimate employment decisions...'such as hiring, granting leave, discharging, promoting, and compensating." *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir. 2001) (citing *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)). The Court of Appeals stated in *Felton v. Polles* that in light of the fact that Title VII principles informed disparate treatment claims brought under § 1981 as well, both contained the requirement that the complained-of conduct had to rise to the level of an "*ultimate employment decision*." *Felton v. Polles*, 315 F.3d 470, 486 (5th Cir. 2002) (reasoning that no distinction has been drawn with respect to retaliation as opposed to disparate treatment claims in that the requirement still exists that 'complained of conduct' under

the Title VII-informed § 1981 rubric must rise to level of an *ultimate employment decision*). The Court of Appeals has "determined that only "ultimate employment decisions," "such as hiring, granting leave, discharging, promoting, and compensating" satisfy the "adverse employment action" element of a prima facie case of retaliation." *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001) (citing *Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995)).

As Metro points out, the Fifth Circuit Court of Appeals "has also consistently held that hostility from other employees, and the resulting anxiety, does not constitute an ultimate employment decision." *Padilla v. Carrier Air Conditioning*, 67 F. Supp. 2d 650, (E.D. Tex. 1999) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 706 (5th Cir. 1997); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 431 (5th Cir. 1992). Furthermore, the Court of Appeals has also held that increased criticism of an employee's work does not constitute a tangible employment action. *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707-08 (5th Cir. 1997) (addressing that "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee – anything which *might* jeopardize employment in the future" were not ultimate, adverse employment actions)); *See also Thompson v. Naphcare, Inc.*, 117 Fed. Appx. 317, 323 (5th Cir. 2004) (not designated for publication). Similarly, disciplinary actions in the form of reprimands do not constitute ultimate employment decisions as a matter of law in the retaliation context. *Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citing *Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002)). Title VII does not address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions. *See Banks v. East Baton Rouge Parish School Board*, 320 F.3d 570, 575 (5th Cir. 2003) (citing *Burger v. Cent. Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir. 1999).

### (ii.) Relevant Discriminatory and Retaliatory Acts Under Consideration

Preliminarily, the court notes its agreement with Metro that Hamilton's assertion she was denied promotions based upon her 1989 sexual harassment claim and the difficulties surrounding her promotion to journeyman mechanic in 1994 are too remote in time to provide a causal connection to any of the alleged failures to promote which did not occur until 2001. *See Raggs v. Mississppi Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002). Rather, the court concentrates on the alleged failures to promote and alleged retaliatory acts as falling under Hamilton's charges and the relevant discrimination statutes.

### (1.) 2001-Application for the Relief Pool

In an application process which took place in late 2001 and ended on December 17, 2001, Hamilton was not allowed to interview for a relief pool position because of a disciplinary

action (five day suspension) on her record, dated May 30, 2000, received for being absent without leave.  Hamilton asserts that such disciplinary actions only disqualified one for applying for any position for one year; as proof, Hamilton attaches a letter written to Hilda Duarte of the EEOC by Deborah Richard, Senior Staff Attorney for Metro, wherein Ms. Richard states that

> [H]ourly Maintenance division employees are not eligible for promotion to salaried positions if they have been counseled or disciplined for poor performance within one year prior to their application for such positions.  (Doc. 34, Exh. N.)

Further, Hamilton has asserted that §201(A) of the Transport Union Labor Agreement controls Hamilton's employment, and because this section limits consideration of discipline on an employee's record to one year, she should have been allowed to interview for this 2001 relief pool position.  (Doc. 34, p. 7; Exh. K.)  The relevant section of the Labor Agreement states

> Section 201.  Employee's Entry Record
> (A)  Any entry in an employee's performance record may be used for a one year period from the date of the offense in determining disciplinary action.

However, the court agrees with Metro's analysis that the clear language of section 201(A)'s "one-year period" applies only for the purpose of "determining disciplinary action," and as Metro argues, there is no proscription in the aforementioned section to the use of a disciplinary action itself for any other purpose.  Rather, the evidence admitted shows it is generally agreed that disciplinary actions bar applicants for two years.  John Franks, Senior Director of Bus Maintenance, has stated an employee who has a disciplinary action report on his or her record within the last two years is not allowed to interview for a different position (Doc. 30, Franks Aff., Exh. 3, ¶ 4; Franks Depo., Exh. 4, pp. 99-100); and Hamilton in her own deposition exhibited agreement with the proposition that a suspension is held on one's record for two years, and that a disciplinary action has a 'window' of two years.  (Doc. 30, Hamilton Depo., Exh. 1, pp. 65 & 72.)  Ms. Richard's April 23, 2004, letter addresses the actions to which the letter was tailored, namely Hamilton's latest EEOC charge that she had not been allowed to interview for a Yard Supervisor on February 17, 2004, because she had been reprimanded and counseled relating to her performance on December 5, 2003, through March 5 and 15, 2004.  These actions occurred within one year of each other.

Furthermore, Metro asserts that this rule does not even apply to the positions at issue.  The terms of the collective bargaining agreement do not apply to positions that are not covered by the agreement, such as the relief pool or Yard Supervisor.  Metro points out that under the Labor Agreement Union 260 is authorized to represent those employees listed in Appendix B of the Agreeement (Doc. 36, p. 9; Att. 1); and Metro states the Appendix does not list Yard Supervisor or Relief Pool positions.  (*Id*.; Att. 2.)  Therefore, Metro's reliance on the two-year prohibition is a legitimate, nondiscriminatory reason for its disallowance of Hamilton's

applications, and her disqualification from interviewing was not in contravention of the bargaining agreement.

With respect to Hamilton's *retaliation* claims, Metro correctly asserts that Hamilton cannot rely on this denied promotion in 2001 as a basis for a retaliation claim because this denial occurred prior to the protected activity in which she engaged, namely the charge she filed in December 2002; therefore, Hamilton's claims are wholly denied.


### (2.)     June 2002-Application for the Relief Pool

In June 2002, another round of interviews was held for one vacancy in the relief pool, Hamilton was interviewed by a panel, all candidates were ranked numerically based on their interviews, and "Tyron Pleasant," a black male, received the highest score and was selected for the vacancy.   (Doc. 30, Lindemann Aff., Exh. 2, ¶ 3; *See also*, Attachment "A.") Hamilton asserts, without citation to the record, that Pleasant "did not possess the depth of on hand experience of [Hamilton] and therefore was less qualified." (Doc. 34, p. 9.)  Hamilton argues that she was not given the opportunity to participate in an "apprenticeship program" which was "essentially training ground for promotion into management," and that Pleasant and "all other potential selectees" were "given an opportunity to attend the management training." (*Id*. at pp. 8-9.)  Hamilton does not explain in any greater detail why she was deprived of the opportunity to receive this training, nor does she describe the function of this apprenticeship program, its recruits or apprentices, and/or the positions such apprentices held at Metro and did or did not obtain.

Metro points out correctly that the selection of Pleasant for the relief pool in June 2002, also occurred prior to Hamilton engaging in any protected activity.  Hamilton had neither gone before the Board (September, 2002) nor filed her first EEOC charge (December 2002). Hence, Hamilton's retaliation claim must fail in this regard.

Furthermore, there is no evidence that Pleasant was selected to circumvent Hamilton's charges of discrimination, and there is no clear evidence that Pleasant's apprenticeship training had any role in the selection process, nor is any explanation provided why Hamilton would have been intentionally deprived of such apprenticeship training.  Even if Pleasant's participation in such an apprenticeship program did play a role in his selection, Pleasant's apprenticeship training or higher interview score simply form the legitimate, nondiscriminatory reasons for his hire.  There is also no evidence that Metro employee Ronald Chase was involved in Pleasant's selection, and his opinion, according to Metro, is pure conjecture and speculation. (Doc. 36, p. 14.) The court agrees that no evidence supports the theory that the failure to promote Hamilton to this position was a pretext for discrimination.  (Doc. 36, p. 5.)  Therefore, Hamilton's claim is denied.

### (3.)    July/August 2002-Application for Yard Supervisor II

In July/August, 2002, Hamilton applied for a salaried position with Metro as a Yard Supervisor II in the Maintenance division, and she was interviewed by Donna LaForce and general foreman David Swenson. (Doc. 30, Exh. 1, Hamilton Depo., pp. 19-21; Donna LaForce Aff., Exh. 6, ¶ 1 & 4.) A Yard Supervisor II is responsible for managing the afternoon pull-in of buses, with responsibilities including debriefing bus operators, inspecting incoming buses for obvious defects and/or damage, directing the work of mechanics, and interacting with maintenance repair to ensure buses are repaired, serviced, fueled, cleaned, and ready for pull-out the next day. (Doc. 30, LaForce Aff., Exh. 6, ¶ 3.) The Yard Supervisor II position required 3 to 5 years experience in yard supervision, mechanical experience servicing *vehicles*, and, or preventative maintenance experience. (Doc. 30, Exh. 7) (emphasis added). LaForce avers she interviewed Hamilton, Donald May, John Cruz Stellus, Paula Russell, Albert Stocker, and Tobias Barber for the position, May and Stocker being external candidates, and selected Donald May, a white male, because he was the best qualified. (Doc. 30, LaForce Aff., Exh. 6, ¶ 4.)

Hamilton argues that Metro's legitimate non-discriminatory justification for hiring May was pretextual because she had more experience maintaining buses (Doc. 34, p. 26), that as a certified Journeyman Mechanic with over 10 years of experience, she had experience in "bus mechanical," "major inspections," as an *acting* Yard Supervisor, and as the 'lead person' standing in as temporary replacement for the acting Foreman, Foreman being a higher position than Yard Supervisor itself (Doc. 34, p. 27); additionally, Hamilton stresses her positive recommendations from George Herman (Doc. 30, Exh. J), Willie Wanza, David Stewart (*Id*., Exh. G), and her two-time nomination as "Top Technician" in the Maintenance Department (*Id*., Exh. I), arguing that all such factors should have garnered her the Yard Supervisor position. However, according to LaForce, May had extensive experience in preventive and mechanical maintenance, management of fleet vehicles and equipment, and supervision and management of employees over a 20 year career with the U.S. Marine Corps. (*Id*.; *See also* Attachments A & B, Exh's 8 & 9.) LaForce avers that the Yard Supervisor II at Fallbrook directs the work of several mechanics and indirectly supervises the many bus operators assigned to that facility, but that Hamilton did not have significant experience supervising or managing employees, when compared with the successful candidate, May, and that Hamilton did not "sell" her skills and experience for the job in the interview. (*Id*.) Finally, LaForce further avers that John Franks, Senior Director of Bus Maintenance, did not participate in the interviews for the position and did not direct or tell her who to choose for that position. (*Id*. at ¶ 5.)

Hamilton asserts that Metro's use of subjective criteria operated to discriminate against her, namely, Donna LaForce's averment that she "did not 'sell' her skills and experience

for the job" during the interview. (Doc. 30, Exh. 6, ¶ 4.) However, as shown above, Metro also argues Hamilton was not promoted because the successful applicant, May, was more qualified.

The court agrees with Metro that Hamilton's non-promotion to Yard Supervisor II in 2002, and May's hiring instead are not actionable either as acts of discrimination or retaliation. First, no discrimination occurred because Metro did not hire a less qualified person than Hamilton. Even though Hamilton asserts May had no experience working on buses, Metro points out the Yard Supervisor position does not require *bus* maintenance experience; rather, the position requires three to five years of mechanical experience servicing ***vehicles*** and/or preventative maintenance. (Doc. 30, Exh. 7.) The evidence concerning May, including his resume, show he had vast experience servicing vehicles in the military.

Franks also stated in his deposition that the Yard Supervisor position is not really one involving actual mechanical maintenance of the buses, but rather, it is a clerical or supervisory position. (Doc. 30, Franks Depo., Exh. 4, pp. 25-27). Moreover, according to LaForce, May had extensive experience in preventive and mechanical maintenance, management of fleet vehicles and equipment, and he had *supervised* and *managed* employees over a 20 year career with the U.S. Marine Corps. (*Id.*; *See* Attachments A & B, Exh's 8 & 9) (emphasis added). Metro argues Hamilton's own testimony shows she did not have the relevant full-time *supervisory* experience over, or management of, maintenance employees during her employment with Metro. (Doc. 30, LaForce Aff., Exh. 6, ¶ 4; Doc. 36, p. 16.) (emphasis added). Hamilton's supervisory experience consisted of, at most, '*lead person*' duties; and, Franks avers 'lead persons' do not perform the full array of supervisory duties at Metro, they are not supervisory Foremen - they do not discipline employees, engage in support duties for legally-required drug testing, make safety calls or sign off on work orders. (Doc. 30, Exh. 4, Franks Depo., pp. 51-52.) Hence, Metro argues May was both (1) better qualified, and (2) had greater supervisory experience. (Doc. 36, p. 16.)

Employment discrimination laws are not intended to be a vehicle for judicial second-guessing of an employer's decision. *EEOC v. Louisiana Office of Community Services*, 47 F.3d 1438, 1448 (5th Cir. 1995). Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). As a general rule, judges are reluctant to substitute their views for those of individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field. *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993). Showing that two candidates are similarly qualified does not establish pretext under this standard. *Id*. To raise a fact issue showing that an employer's reason for selecting another candidate, i.e., better qualifications, is in fact a pretext for unlawful discrimination, a plaintiff's qualifications must "leap from the record and cry out to all who would listen that he is vastly - or even clearly - more qualified for

the subject job." *See Price v. Federal Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002). Hamilton does not raise her claim to such a level.

Second, this alleged adverse action, the failure to promote Hamilton and May's selection for Yard Supervisor, occurred prior to Hamilton's engagement in any protected activity. Hamilton filed her first Charge of Discrimination with the EEOC forming the subject of this action, alleging she had been discriminated against on the basis of race, age, and gender through non-selection for the position May had instead received on December 6, 2002. (Doc. 30, Exh. 27.) Retaliation cannot occur when the alleged adverse action, denial of a promotion in this instance, precedes the protected activity itself - the making of a charge. Hence, Hamilton's claims are denied with respect to May's selection.

### (4.) December 2002/March 2003-Application for Yard Supervisor

On December 15, 2002, Donald May, who was employed with Metro for only three months, resigned the Yard Supervisor's position. (Doc. 34, p. 11.) In early 2003, David Swenson and maintenance superintendents Ignacio Ybarra and Melvin Thomas, general foreman Marlon King, and Thomas Osborne of Human Resources interviewed Hamilton along with external applicant Dennis Koppa, and internal applicants John Cruz Stellus, Sheila Pichon, Woodrow Williams, and Corliss Madison. (Doc. 30, David Swenson Aff., Exh. 11, ¶¶ 2 & 3.) Swenson avers Koppa was selected because he scored highest on the interview, and Swenson further adds that Koppa, a white male, had many years experience in maintenance, including fleet management, preventive maintenance, maintenance planning and repair, supervision of maintenance employees, and experience using SEMA, the maintenance computer system used by Metro. (*Id.* at ¶ 3, Att. B & C; Exh's 12 & 13.) Metro refers to and attaches an "Applicant Interview Assessment Report" for Hamilton, dated March 6, 2003, which states that "applicant appears to not meet the requirements of the managerial skills required for the position." (Doc. 30, p. 4, Swenson Aff., Exh. 11, ¶ 4, citing Attachment F; *See also* Exh. 10.) Swenson further avers that the interview panel determined that Sheila Pichon, who was the second highest scorer in the interviews, was also qualified for the position. (Doc. 30, Swenson Aff., Exh. 11, ¶ 4, Att. A, D & E; *See also* Exh. 14.)

Presuming Hamilton adequately states a claim for retaliation, the selection of Koppa falling after her protected activity, Metro correctly argues that it had a legitimate nondiscriminatory reasons for selecting Koppa, which Hamilton does not rebut. (Doc. 36, p. 6.) Although Hamilton asserts that Dennis Koppa was not more qualified than she was for the Yard Supervisor position when he was selected in 2003, such an assertion is not supported by specific facts nor competent evidence. Hamilton had eight years of experience, but Koppa had a higher interview score and also had many relevant years of experience, having begun as a journeyman mechanic in 1980, and

having held positions of increasing responsibility in fleet automotive repair, hydraulic diagnostics, and fleet management. (Doc. 30, Exh. 12.) In order to show that Metro's reason for selecting Koppa was a pretext for discrimination, Hamilton's qualifications must "leap from the record and cry out to all who would listen that [s]he is vastly - or even clearly - more qualified for the subject job." *See Price*, 283 F.3d at 723 (5th Cir. 2002). Metro's arguments that it picked Koppa because he was more qualified are legitimate and Hamilton's claims are denied with respect to Koppa's selection.

### (a.) Metro did not violate §507 of the Collective Bargaining Agreement

Hamilton claims Metro violated §507 of the labor agreement by hiring external candidates such as May and Koppa, as §507 provides Metro will not hire an external candidate unless there is no qualified internal candidate to fill the vacant position.[3] Metro argues that as with § 207, § 507 applies only to those jobs reflected in Appendix B of the agreement, not the non-union, management position of Yard Supervisor. (Doc. 36, p. 19.) Hamilton has not rebutted this assertion.

### (5.) February 2003-Application for Yard Supervisor II

Upon Koppa's departure, Hamilton's unsupported assertion that she was next in line for the position is unsubstantiated by the evidence, as Sheila Pichon, a black female, was ranked second to Koppa based on the interview process. (Doc. 30, Osborne Aff. Exh. 16, ¶ 2; Exh. 31.) Metro asserts that in keeping with its policies, the vacancy created by Koppa's resignation was filled by the next highest scorer, Pichon, as positions which have been posted and awarded may be filled from the original applicant pool if a vacancy re-occurs within 60 days of the hire date. (Doc. 30, Osborne Aff., Exh. 16, ¶ 3; "Metropolitan Transit Authority Guideline," Exh. 32.) Because Hamilton has not exhausted her remedies as to this position, she is limited to race-based claims under § 1981. Hamilton's putative *prima facie* case appear to fail in that both she and

---

[3]**Section 507. Job Vacancies and New Positions**
(B) When a vacancy exists within the Vehicle Maintenance Division, it shall be filled on the following basis:
1)    Employees in the Vehicle Maintenance Division at the facility where a vacancy exists will be allowed an opportunity to bid for such position if they possess the requisite skill, work record, and ability to perform the job. If the position is not filled through such bidding, then all employees, regardless of facility location, who are in the Vehicle Maintenance Division will be permitted to bid on such vacant position if they possess the requisite skill, work record and ability to perform the job. If the position is not filled on this basis, then any employee in the Maintenance Department who possesses the requisite skill, work record and ability to perform the job can bid on it. If the position is not filled on this basis, then any Metro employee who possesses the requisite skill, work record and ability to perform the job can bid on it. If the vacant position is not filled on this basis, it can be filled by a new hire. (Doc. 34, "Employee Performance Code and Work Rules," Exh. K.)

Pichon are black. Nevertheless, Hamilton asserts Pichon was selected in part because she received support in the form of a letter of recommendation from Donald Madison, one of the supervisors Hamilton charged with sexual harassment in 1989. (Doc. 34, p. 33; Exh. Q.) However, as Metro correctly points out (Doc. 36, p. 20), the aforementioned memo was written *by* Bobby Blue, Support Vehicle Coordinator, *to* Donald Madison and the opinions espoused therein were *not* necessarily Madison's. Furthermore, there is absolutely no evidence that Madison played a role in Pichon's selection as Yard Supervisor.

Furthermore, Hamilton alleges Pichon "was a cleaner who simply cleaned buses and cleaned lanes...[and] did not possess the requisite five years Yard Supervisor, mechanical experience servicing vehicles and/or [sic] preventive maintenance." (Doc. 34, p. 12.) The Fifth Circuit Court of Appeals has rejected the argument that greater length of service alone is sufficient to raise an inference of discrimination. *Price*, 283 F.3d at 723 ("Price's better education, work experience, and longer tenure with the company do not establish that he is clearly better qualified."); *See also Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir. 1993) ("As for Bodenheimer's attempt to equate years served with superior qualifications, we regard such reasoning as unpersuasive.") Regardless, there is no evidence in the record to support Hamilton's assertion that she was next in line after Koppa in the applicant pool or that she was better qualified than Pichon.

As part of her argument, Hamilton assumes a journeyman mechanic is more qualified than a service lane cleaner for the Yard Supervisor position, but she does not offer any evidence to support this assertion. (Doc. 36, p. 19.) The only evidence in the record contradicts this assertion. John Franks has averred that Yard Supervisors are made up of individuals with varying backgrounds, including journeyman mechanics *and* service lane cleaners, such that being a journeyman mechanic is not necessarily better preparation for the position than being a cleaner. (Doc. 30, Franks Aff., Exh. 3, ¶ 3.) Franks testified both journeymen mechanics and service lane cleaners have advanced to the position of Yard Supervisor. (Doc. 30, Franks Depo., p. 96.) Franks also averred that a Yard Supervisor's duties do not involve hands-on maintenance or major repairs on buses, yet service lane cleaners work the bus parking yard and have particular familiarity with the operations of the yard duties; and, in fact, the Yard Supervisor position was developed specifically to provide a career path for service lane cleaners. (*Id*.) Therefore, Hamilton's claims with respect to Pichon's promotion are denied.

### (6.) March 2004-Discipline

In March 2004, Hamilton applied yet again for a Yard Supervisor II position, but was allegedly not allowed to interview for the position because of Metro's stance on disciplinary actions within the past two years. (Doc. 30, Franks Depo., Exh. 4, pp. 45-7, 85, 118-121, 178-79;

Franks Aff., Exh. 3, ¶ 4.)  Hamilton appears to argue she has established *prima face* race and gender based claims for discrimination based on being denied a promotion to Yard Supervisor in 2004, and additionally, a *prima facie* case of retaliation, arguing that she was subjected to disciplinary actions in order to retaliate against her for her protected activity of filing grievances or charges in 2002, and that she was also disciplined *on purpose* to prevent her from interviewing for the Yard Supervisor position in 2004, and thus being promoted.

First, the court reemphasizes that Hamilton did not adequately exhausted her administrative remedies by adding age and gender *discrimination* claims to her March 18, 2004 EEOC claims.[4]  The court views Hamilton as explicitly describing a *retaliation* claim in her charge.  She uses the word "*harassment*" in her charge, but a claim of harassment does not exhaust her remedies for bringing a claim for discrimination/disparate treatment based on age, sex, and race (leaving her only capable of bringing a claim of race discrimination under §1981); nevertheless, the court will look at all of Hamilton's potential claims in the alternative.  Hamilton also argues, without explanation, that she alleged a continuing violation in her 2004 charge (Doc. 34, p. 18); presumably Hamilton relies on the language, "this type of retaliation *started*..." in order to shore up an allegation of a continuing violation.  (Doc. 30, Exh. 28.) (emphasis added).  However, each disciplinary action Hamilton received, and each occasion on which she was not promoted, must be considered a *discrete* act.

The court notes that Hamilton does not clarify whether she intends to argue that the disciplinary actions *were* the retaliation, whether the discipline was a form of discriminatory harassment, or whether the denials of the promotions to Yard Supervisor were the discriminatory, retaliatory, or harassing acts.  Presumably, because the evidence unequivocally shows that having a disciplinary action in her record disqualified Hamilton from interviewing and being promoted for two years, that discipline was tantamount to a *de facto* denial of future promotions. A logical collapsing of the argument allows the conclusions that Hamilton may be arguing she was retaliated against for her EEOC charge by being purposively denied promotions through the circuitous method of false discipline.  Either way, the court has done its best to make sense of Hamilton's claims and considered them singly and in tandem.

Hamilton argues  that because her suspension was reversed at the second step of the grievance procedure on May 21, 2004 (Doc. 30, Franks Depo., Exh. 4, pp. 173, 185),  this

---

[4]In her EEOC claim, Hamilton stated
"On December 5, 2003, March 5, 2004, and March 15, 2004, I have been written up and given bad evaluations through no fault of my own. This type of *retaliation* started after I filed a charge of discrimination at EEOC on or December 11, 2002....Due to the retaliation I have not been given an opportunity to be selected for supervisory positions such as for the Yard Supervisor...I believe I am *retaliated* against *through harassment* because of my race [sic],. Black, Age, in violation of Title VII of the Civil Rights Act fo 1964, and Section 4(d) of the Age Discrimination in Employment Act of 1967.  (Doc. 30, Exh. 28) (emphasis added).

discipline was a pretext for retaliation.  Hamilton claims  that she was suspiciously "written up" for poor job performance on a "random" search of bus 4846, in an apparent effort to "scrutinize" her actions, when the actual bus she inspected was, *in fact*, 4836.  (Doc. 34, p. 13; Exh. S.) Although this discipline was reversed  through the grievance process, she maintains the disciplinary action prevented her from interviewing for a Yard Supervisor position.  (Doc. 34, p. 13-14.)

Hamilton further argues she was more heavily scrutinized after relocating to the Fallbrook facility.  (*Id*. at p. 14.)  On December 3, 2003, Hamilton had received a disciplinary action report, a "reprimand" for poor job performance  related to a failed post-inspection of bus number 3233.  (Doc. 30, Hamilton Depo., Exh. 1, p. 138; Exh. 18.)  Through the grievance process, the reprimand was reduced to a lower level of discipline, management counseling, by superintendent LaForce.  (Doc. 30, Hamilton Depo., Exh. 1, p. 139.)  Hamilton states that receiving discipline for a missing shock on bus 3223 was improper because she did not work on the bus, and that such discipline was in fact reduced.  (Doc. 34, p. 15.)

Hamilton and other mechanics were also disciplined for poor job performance relating to bus number 4117, a bus that was involved  in a major traffic accident after she had inspected it during her assignment to the Polk facility.  (Doc. 30, Franks Aff., Exh. 3., ¶ 3.)  The memorandum prepared for the accident stated the left front wheel assembly separated from the bus and struck a privately owned vehicle causing damage.  (*Id*, Att. A, p. 1.)  The report stated that the cause of the wheel separation was a direct result of the wheel bearing, retaining nut, and setscrew not being properly torqued during an installation process which had occurred as part of a two-wheel, front brake job occurring on July 4th through the 5th, 2003.  (*Id*.)  The report further stated that within the 27,000 miles from the brake work to the day of the accident, this bus had received four major inspections; that in major inspections, the front end king pins and wheel bearings are to be checked; that human error was "most likely the cause for the improper torquing of the adjusting nut set screw on the wheel bearing;" that the bus "went through four different PMI's before failure;" that "[i]f this check was done properly, the problem might have been found before failure occurred," but "[t]hat is not to say that the inspection was not performed properly."  (*Id*. at pp. 2-3.)  Metro also refers to a memorandum entitled "Step One (1) Grievance Response" dated March 31, 2004, from James Perkins, Superintendent, Polk Maintenance, wherein it was stated that Hamilton had been "informed that her level of performance when she performed her inspection of bus 4117 was unacceptable and did not conform to standards," and that when she "performed her inspection the defect of a [sic] improperly torqued bolt would have been identified."  Hamilton received management counseling in this incident, and other inspectors who had inspected the bus in the past received discipline in the form of counseling or reprimands.  (Doc. 30, Hamilton Depo. Exh. 1, pp. 140-141; Franks Depo., Exh. 4, p. 186.)  Nevertheless, Hamilton argues she was

unfairly held responsible for the problems with bus 4117, as such bus was inspected over six months earlier, and "standing policy and practice" at Metro was that one was not responsible for work after 14 days. (*Id*. at 16-7.) Metro disputes Hamilton's assertions that these disciplinary "management counselings" were not sufficient to bar her from interviewing, but granting such assertions to be true *arguendo*, Metro points to another disciplinary action in Hamilton's record which disqualified her application for promotion and does not run afoul of a "14-day rule." (Doc. 36, p. 21.)

In particular, on March 8, 2004, Hamilton received a reprimand for a poor work performance violation dated February 19, 2004, in relation to a failed post-inspection audit on bus number 4704. (Doc. 30, Exh. 18.) Although Hamilton challenged this reprimand through grievance procedures, management's actions were upheld. (Doc. 30, Exh. 23.) Hamilton states that although she identified the problem of "slack brakes" on another bus, 4704, she was still held responsible for this defect which she properly addressed. (*Id*. at p. 16.)

It is undisputed that at the time of the latter interviews for Yard Supervisor in 2004, Hamilton had a disciplinary action on her record due to poor performance on bus 4704, which was effective for 2 years; Hamilton herself was aware of Metro's practice to consider disciplinary action reports on an individual's record for two years for purposes of determining eligibility to interview. (Doc. 30, Exh. 20; Doc. 30, Exh. 1, Hamilton Depo., p. 73; Franks Depo., Exh. 4, p. 99-100.) Hamilton's argument that § 201(A) of the bargaining agreement between Metro and Local 260 prohibits consideration of discipline beyond a year incorrectly interprets the following language which, in fact, explicitly refers to the use of an employee's performance record for disciplinary action within a year from any offense, "[A]ny entry in an employee's performance record may be used for a one year period from the date of the offense in determining disciplinary action." (Doc. 34, Att. 1.) Moreover, the collective bargaining agreement applies only to "...those Part-time Operators an full-time employees whose job titles are listed in Appendix B of this Agreement..." (Doc. 34, Att. 2, "Appx. B".)

Metro argues that Hamilton must do more than show a conflict between her perception of her performance and Metro's assessment of her performance, but rather, she must present evidence that supports an inference that Metro's decision was motivated by unlawful considerations. Metro argues the question is not whether it made an erroneous employment decision; the question is whether the decision was made with an unlawful motive. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *See also Litle v. Republic Refining Co.*, 942 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."); *Sandsted v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) (An employer is entitled to

be unreasonable, as long as it does not act with discriminatory animus). There is no evidence that the Quality Assurance inspector, Floyd Lufsey, who conducted the examination of Bus 4704, was aware of Hamilton's protected activity; and, the evidence shows Lufsey selected buses for audit randomly. (Doc. 30, Exh. 22.) The requisite causal connection for showing a *prima facie* case of retaliation is established only where the evidence demonstrates that the employer's decision was based in part on its knowledge of the employee's protected activity. *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

Hamilton's theory that Supervisor Franks engaged a network of subordinates to conspire and retaliate against her are also based on 'conclusory allegations.' Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic arguments are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *See Caudillo ex rel Caudillo v. Lubbock Independent School District*, 311 F. Supp. 2d 550, 558 (N.D. Tex. 2004) (citing *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1993)). A party's subjective beliefs about discrimination are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1986); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825 (1992).

### (iii.)    Equal Pay Act Violations & Hostile Work Environment

On August 29, 2003, the Honorable Vanessa Gilmore dismissed without prejudice Hamilton's claims for hostile work environment and unequal pay. (Doc. 9.) Metro had argued in its Motion to Dismiss that Hamilton had never filed charges with the EEOC alleging either of these violations, and hence, had not exhausted her administrative remedies. (Doc. 6, p. 3.) This court subsequently denied Hamilton's request to reconsider Judge Gilmore's decision, but allowed Hamilton the opportunity to amend her complaint. (Doc. 28.)

### (a.)  The Equal Pay Act

However, though Hamilton appeared to abandon her Equal Pay Act claims in her First Amended Complaint (Doc. 16, p. 12), she nevertheless continued to factually allege that

> Plaintiff was required to perform her previous duties as Journeyman Mechanic and those of Yard Supervisor at an annual salary of $52,000 per year. Plaintiff performed the duties as a Yard Supervisor relief under similar working conditions as had previous Yard Supervisors. Yet she was paid less than the white males who were performing only the duties of a Yard Supervisor. (*Id.* at p. 5, ¶ 12)

Based upon her deposition testimony, Metro argued in its Summary Judgment Motion that Hamilton's chosen 'comparators,' men named Carlton and Michael, were in fact "salaried Yard Supervisors," whereas she was an hourly employee. (Doc. 30, Exh. 1, pp. 160-62.) In her response to the Motion for Summary Judgment, Hamilton stated that she did not have enough discovery evidence from Metro in order to respond to these arguments by Metro's. (Doc. 34, p. 35.)

In order to make out a case under the Act, Hamilton would first bear the burden of proof and must show that an employer pays different wages to employees of the opposite sex "for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions." *Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 722 (5th Cir. 1970).[5] Hamilton would not have to demonstrate that any other employee's job and her own are identical, she has only to show that the skills, effort, and responsibility required in performing the jobs is substantially equal. *Cox v. Home Insurance Co.*, 637 F. Supp. 300, 302 (N.D. Tex. 1985) (citing *Pearce v. Wichita County, Wichita Falls, Texas, Hospital Board*, 590 F.2d 128, 133 (5th Cir. 1979)).

As Metro correctly points out, Hamilton has failed to make a *prima facie* showing as there is no evidence substantiating the salaries of the male comparators and these comparators did not appear to be performing the same work as Hamilton. (Doc. 30, p. 25.) Therefore, Hamilton's Equal Pay Act claim must be dismissed.

### (b.) Harassment/Hostile Work Environment

Though Hamilton's general harassment claims were dismissed without prejudice, as described above, Hamilton may nevertheless allege a cause of action for racial harassment under § 1981.[6] In order to establish a *prima facie* case of racial harassment based upon a hostile work environment, a plaintiff must show that: "(1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term[,] condition or privilege of employment." *Polles*, 315 F.3d at 483 (citing *Celestine v. Petroleos de Venezuela SA*, 226 F.3d 343, 353 (5th Cir. 2001)).

For harassment to affect a "term, condition, or privilege of employment" it must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive

---

[5]To establish a prima facie case under the EPA, a plaintiff must show (1) that his or her employer is subject to the Act; (2) that he or she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) that he or she was paid less than the employees of the opposite sex providing the basis of comparison. *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5 th Cir. 1987) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 722-23 (5th Cir. 1986).

[6]It is now recognized that a plaintiff may state a claim for racial harassment and discrimination under 42 U.S.C. § 1981. *Felton v. Polles*, 315 F.3d 470, 483 (5th Cir. 2002).

working environment." *Celestine*, 266 F.3d at 353 (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)). See also *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (citing *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1049, n. 9 (5th Cir. 1996)).

In order to be actionable, a racially objectionable comment must be both objectively and subjectively offensive, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." See *Butler*, 161 F.3d at 269 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). Furthermore, whether an environment is hostile or abusive depends on a totality of the circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance [destroying a protected classmember's opportunity to succeed in the workplace]." *Id.* (citing *DeAngelis v. El Paso Municipal Police Officers Assoc.*, 51 F.3d 591, 593 (5th Cir. 1995) (hostile work environment based on sexual harassment)). The Fifth Circuit Court of Appeals has added to this non-exclusive list, an inquiry into "whether the complained of conduct undermined the plaintiff's workplace competence.")); *Butler v. Yselta Independent School District*, 161 F.3d 263, 270 (5th Cir. 1998).

In her First Amended Complaint, Hamilton alleged that she was subjected to a hostile work environment including "being yelled at, threatened, cursed, and abused by co-workers and supervisors," as well as "racially hostile work environment and conditions, which discriminated against her because of her race, sex, and age." (Doc. 15, ¶ 12-13.) However, in response to Metro's Motion for Summary Judgment, Hamilton provided only one example, dating from July 3, 1991, which she asserted was racially hostile behavior. She stated that further discovery was necessary, particularly from LaForce, to substantiate her harassment claim. (Doc. 34, pp. 35-36.)

Metro notes Hamilton contended at her deposition that Franks controls hiring at Metro,

> John Franks - he's - it's like a network of people and they do what John tells them to do because they're - he is their superior and whoever he wants to conduct things and whoever he wants to put into the positions, even though they're interviewing me he is going to have the last word. (*Id.* at p. 35.)

According to Hamilton, the general foreman at the Polk Street facility,

> Nolan Taylor told me that even if you do good in the interview, before it goes downtown John Franks will make - he would make adjustments to make it look like you didn't do good in the interview. (*Id.* at 13, 35.)

Hamilton further alleged that Franks has harassed her in 1996 because she stood up for her rights. (Doc. 30, Hamilton Depo., Exh. 1, p. 51.) Specifically, Hamilton alleged that Franks wanted her not to pass the exam for journeyman mechanic. (*Id.* at 43-44.) When asked how Franks otherwise harassed her, she stated, "every facility that I [sic] bidded on, they would start giving me all these

hard jobs...[t]hey would put me on brake jobs by myself...and then the superintendent was constantly trying to write me up for stuff that didn't make any sense." (*Id*.) She reported this harassment to George Herman, Franks' superior at the time, and Herman, in a meeting with Plaintiff and Franks in the 90's, directed Franks to tell the superintendents to stop harassing Hamilton. (*Id*. at p. 42-43; 167-68.)

In addition, Hamilton asserts that, after she became a journeyman mechanic, Franks instructed superintendents to harass her, and always tried to keep her from promotions by overseeing the promotions process, as "everyone knows that John has the last say on the interview process." (*Id*. at 41-44.) She alleges Franks told supervisors to give her a hard time. (*Id*. at pp. 51-53.)

Hamilton also alleges she was harassed by being disciplined. She was harassed by James Gassinot, her supervisor at the Polk Street facility, whom she claims was "out to get [her]," and "wrote her up" for taking a leave for emergency surgery. (*Id*. at 52, 54.) However, Hamilton also stated that Gassinot confused her sick time with her workers' compensation time off. (*Id*. at 54-55.) She also felt harassed when she received a "write up" in 2000, by James Peters for being A.W.O.L. on Memorial Day. (*Id*. at 55.) However, Hamilton admits foreman Greg Branch warned her that everyone was supposed to work that holiday. (*Id*. at 56.) Hamilton also testified during her deposition that she was not subjected to any harassment between her 2000 disciplinary action report, wherein she was disciplined for being AWOL, and her transfer to Fallbrook in late 2003. (Doc. 3, Hamilton Depo., Exh. 1, p. 60.)

After transferring to Fallbrook, Hamilton alleges that Franks and LaForce further harassed her by giving her discipline. (*Id*. at 60.) With respect to the Yard Supervisor II position in 2002, Hamilton alleges LaForce wanted a white male for the position, and Hamilton believes she was discriminated against because LaForce hired a white male outside of Metro, because she went through the motions of interviewing her when they knew who was going to be selected for the position, and because LaForce did what Franks asked her to do. (*Id*. at 85-86, 88-90.) Hamilton further states that LaForce does not like black women, "probably because [LaForce] is white." (*Id*. at 183.)

Other than several conclusory allegations and some subjective beliefs, the court finds that Hamilton has presented no evidence that her harassment was based upon race or that any of the aforementioned actions were sufficiently severe or pervasive to alter Hamilton's employment conditions. Accordingly, Hamilton's hostile work environment/harassment claims must be dismissed.

## V.        Conclusion

Based upon the court's review of the foregoing facts and its analysis of applicable

precedent, it is hereby

ORDERED that Plaintiff, Cherlyn Kay Hamilton's Motion to Strike (Doc. 32), Motion for Continuance (Doc. 33), and Motion to Compel (Doc. 43) are DENIED; and, it is further

ORDERED that Defendant, the Metropolitan Transit Authority's Motion for Summary Judgment (Doc. 37) and Motion to Strike (Doc. 37) are GRANTED.

SIGNED at Houston, Texas, this 28th day of September, 2004.



MELINDA HARMON
UNITED STATES DISTRICT JUDGE